O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NOMADIX, INC., | ) | Case No. CV 10-00381 DDP (VBKx) |
| | ) | |
| Plaintiff, | ) | **CLAIM CONSTRUCTION ORDER** |
| | ) | |
| v. | ) | [Plaintiffs' Opening Claim |
| | ) | Construction Brief Filed on June |
| SOLUTIONINC TECHNOLOGIES | ) | 11, 2010; Counterclaimant's |
| LIMITED, a Canadian | ) | Opening Claim Construction Brief |
| corporation, | ) | Filed on March 4, 2011; second |
| | ) | <u>Markman</u> hearing held on September |
| Defendant. | ) | 9, 2011] |
| | ) | |
| _____ | ) | |

Plaintiff Nomadix, Inc. is the owner of U.S. Patent Numbers

6,130,892 ("the '892 Patent"); 7,088,727 ("the '727 Patent");

7,554,995 ("the '995 Patent"); 6,636,894 ("the '894 Patent");

7,194,554 ("the '554 Patent"); 6,868,399 ("the '399 Patent");

6,789,110 ("the '110 Patent"); 7,689,716 ("the '716 Patent"); and

6,875,009 ("the '009 Patent").  The technology at issue generally

facilitates network access, e.g. access to the Internet, by mobile

computers and is widely used at hotels, airports, and public

locations.

///

///

1      More specifically, the '892 Patent, '995 Patent, '099 Patent,

2   and the '727 Patents permit users to access the Internet eventhough

3   their computers are not configured for the particular network they

4   are visiting.  These patents resolve such issues as, for example,

5   when a laptop is configured to connect to only a certain "home"

6   network or, alternatively, to a "proxy server," but has moved to a

7   "foreign" network.  These patents aid with connectivity so that,

8   for example, a business traveler using a company laptop can readily

9   use a hotel's network without manually reconfiguring their laptop

10  for the foreign network.

11      The '894 Patent, '554 Patent, and '716 Patent concern the

12  ability of a network operator to control and customize network

13  access.  For example, the '894 Patent involves the use of a gateway

14  to redirect a computer to a login web page (e.g., a hotel login

15  page).  This technology permits network operators to, among other

16  things, grant network access to guests only after they agree to pay

17  for the service.  The '399 Patent relates to network usage charges

18  and helps facilitate the billing by a network operator of network

19  users by, for example, formatting the network usage data to look

20  like a telephone call record.

21      Nomadix alleges that Defendants have infringed these eight

22  patents.

23      Counterclaimant iBAHN Corporation ("iBAHN") is the owner of

24  U.S. Patent Numbers 6,934,754 ("the '754 Patent"); 6,996,073 ("the

25  '073 Patent"); and 7,580,376 ("the '376 patent").  The iBAHN

26  Patents all describe and claim techniques for providing high-speed

27  network access in hotels, conference centers, and other venues.

28  iBAHN alleges that Nomadix has infringed these three patents.

2

1    **I.     THE CLAIM CONSTRUCTION PROCESS**

2         A patent infringement analysis involves two steps: (1)

3    determining the meaning and scope of the patent claims asserted to

4    be infringed; and (2) comparing the properly construed claims to

5    the accused device.  See generally Markman v. Westview Instruments,

6    Inc., 517 U.S. 370 (1996).  The first step in this sequence is

7    presently before the Court.

8         "It is a bedrock principle of patent law that the claims of a

9    patent define the invention to which the patentee is entitled the

10   right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303, 1312

11   (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  The

12   construction of a particular patent claim term presents a question

13   of law, to be decided by the Court.  Markman, 517 U.S. at 391.

14        The starting point for claim construction is a disputed term's

15   ordinary meaning.  Phillips, 415 F.3d at 1313.  Ordinary meaning,

16   in the patent claim construction context, is the meaning that a

17   person of ordinary skill in the art would attribute to a claim term

18   in the context of the entire patent at the time of the invention,

19   i.e., as of the effective filing date of the patent application.

20   ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed.

21   Cir. 2009).

22        The claims, of course, do not stand alone; a person of

23   ordinary skill in the art "is deemed to read [a] claim term not

24   only in the context of the particular claim in which the disputed

25   term appears, but in the context of the entire patent, including

26   the specification."  Phillips, 415 F.3d at 1313-14 (emphasis

27   added).  Accordingly, the specification is "the primary basis for

28   construing the claims" in light of the "statutory requirement that

3

1  the specification describe the claimed invention in full, clear,

2  concise, and exact terms."  Id. at 1315 (internal quotation marks

3  omitted) (emphasis added).

4      In determining the proper construction, the claim language,

5  specification, and prosecution history – together referred to as

6  the "intrinsic evidence" – are of paramount importance.  Id. at

7  1315 ("[T]he best source for understanding a technical term is the

8  specification from which it arose, informed, as needed, by the

9  prosecution history."(internal quotation marks omitted)).

10 Consistent with this principle, courts have recognized that the

11 specification may reveal a special definition given to a claim term

12 by the patentee that differs from the meaning it would otherwise

13 possess.  Id. at 1316.  In such cases, the inventor's lexicography

14 governs.  Id.  In other cases, the specification may reveal an

15 intentional disclaimer, or disavowal, of claim scope by the

16 inventor.  Id.

17     While the court interprets claim terms in light of the

18 specification, it should generally not "import[] limitations from

19 the specification into the claims absent a clear disclaimer of

20 claim scope."  Andersen Corp. v. Fiber Composites, LLC, 474 F.3d

21 1361, 1373 (Fed. Cir. 2007).  "[T]he distinction between using the

22 specification to interpret the meaning of a claim and importing

23 limitations from the specification into the claim can be a

24 difficult one to apply in practice."  Phillips, 415 F.3d at 1323.

25 In walking this "tightrope," Andersen, 474 F.3d at 1373, the court

26 hews to the question of "how a person of ordinary skill in the art

27 would understand the claim terms."  Phillips, 415 F.3d at 1323.

28     Consideration of intrinsic evidence will resolve any claim

4

1 term ambiguity in most circumstances.  See id. at 1313-14.  Where

2 it does not, however, the court may consider certain "extrinsic

3 evidence."  See id. at 1317.  Expert testimony, for example, may

4 provide helpful background on the technology at issue, explain how

5 an invention works, or establish that a claim term has a particular

6 meaning in the relevant field.  See id. at 1319.  Dictionaries and

7 treatises may also be helpful in this regard.  Id. at 1318.

8 Precedent counsels against reliance on dictionary definitions at

9 the expense of the specification, however, because such reliance

10 "focuses the inquiry on the abstract meaning of words rather than

11 on the meaning of claim terms within the context of the patent."

12 Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145

13 (Fed. Cir. 2005).

14      The court's ultimate goal is to construe the disputed terms in

15 a manner consistent with the way the inventor defined them and a

16 person of ordinary skill in the art would understand them.  "The

17 construction that stays true to the claim language and most

18 naturally aligns with the patent's description of the invention

19 will be, in the end, the correct construction."  Phillips, 415 F.3d

20 at 1316 (internal quotation marks omitted).

21

22

23

24

25

26 ///

27 ///

28 ///

**II.   CONSTRUCTION OF CLAIM TERMS**

 **A. Patents asserted by Nomadix**

**1. '399 patent**

1. "management system"

| NOMADIX'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | a management system that is separate from the network gateway device for managing a property's operations and connected to the network gateway device via a physical link | No construction |

Nomadix states that the term "management system" does not require clarification because it can be readily understood according to its ordinary meaning.  Defendants would describe the term as a system that is (1) separate from the gateway device; (2) utilized for "managing a property's operations"; and (3) connected to the gateway device by a "physical link."  In support of their position that the management system must be physically connected to the network gateway, Defendants rely on language from the specification.  That language, however does not require the limitations Defendants seek.

The '399 Patent specification states that the "network gateway devices communicat[e] with management systems," ('399 Patent 2:45-49); that "[a]ccording to one aspect of the invention, the gateway device is in direct communication with the management system," ('399 Patent 5:21-23 (emphasis added)); and that "[t]ypically, the gateway device [] is connected . . . to the management system . . .

6

." ('399 Patent 6:6-11 (emphasis added)).  None of the language

that Defendants cite requires that the management system <u>must</u> be

physically connected to the gateway device.  The court will not

import a limitation from a preferred embodiment into the claim

terms.  <u>See</u> <u>Andersen</u> 474 F.3d at 1373.  The court declines to adopt

Defendants' proposed construction of "management system."  The

court agrees with Nomadix that no construction is required.

### 2. "absent additional agents implemented by the computer" & "absent additional agents implemented by the user's computer"

| NOMADIX'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| absent additional special client software implemented by the computer for managing the communication between the computer and the gateway service | Defendants do not oppose Nomadix's construction | absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device |

Defendants do not oppose Nomadix's construction.  The court,

therefore, adopts Nomadix's proposed construction for the "absent

additional agents" terms.

### 3. "physical location"

| NOMADIX'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | communication port through which the user's computer accessed the network | No construction |

The '399 Patent claims, among other things, a system to bill a

1  user "wherein the gateway device maintains data representative of

2  the user's physical location and usage of the computer network."

3  ('399 Patent 11:43-55.)  Defendants would construe "physical

4  location" as a "communication port through which the user's

5  computer accessed the network."

6      Defendants' construction is contrary to both the specification

7  and the prosecution history.  The specification discloses that the

8  "gateway device [] includes the ability to recognize . . . the

9  location of computers attempting to access the network," and then

10 proceeds to offer that such a "user/subscriber's location" as,

11 e.g., a "room number."  ('399 Patent 4:36-39, 7:35-37.)  The

12 prosecution history also supports a broader construction of

13 "physical location" than the one Defendants propose.  In an

14 incorporated patent application, "location" is defined, for

15 example, as "a hotel room, a specific address, etc."  (Lezama

16 Decl., Ex. 12, '093 application, at NMDX0011436.)

17     Defendants' construction limits the scope of the claim to one

18 disclosed embodiment.  "The claims, not specification embodiments,

19 define the scope of patent protection."  <u>Kara Technology v.</u>

20 <u>Stamps.com, Inc.</u>, 582 F.3d 1341, 1348 (Fed. Cir. 2009).  The court

21 will not limit the claim to a single embodiment.  The court rejects

22 Defendants' proposed construction and concludes that no

23 construction of the term "physical location" is necessary.

24

25             4. "Collecting data corresponding to the user's
                  access to said computer network, including
                  physical location of the user and the user's

26                network usage, in said network gateway device"

27

28

8

| NOMADIX'S CONSTRUCTION | HEWLET-PACKARD'S CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | monitoring and recording "data representative of the user's access to the computer network," including a "physical location" of the user and the "user's network usage," in said network gateway device | No construction |

Defendants argue that the term "collecting data corresponding to the user's access . . . in said network gateway device" requires construction in order to distinguish, for purposes of the '399 Patent claims, "collecting" from "maintaining."  Nomadix maintains that the term does not require construction.

Defendants position is based on a difference in verb choice in the claims of the '399 Patent.  Claims 1, 10, and 13 describe a gateway device that "maintains" data representative of the user's access, usage, and/or physical location.  (See, e.g., '399 Patent 11:23-25.)  Claims 6 and 18 describe a gateway device that "collects" data.  (See, e.g., '399 Patent 10:64-65.)  Based on this difference, Defendants propose that a gateway device that "collects" data is properly limited to one that both monitors the network traffic and then records that information.  (Defendant's Claim Construction Brief 45:19-20.)

The court agrees that maintaining data and collecting it are distinct and that these two terms are distinct.  Beyond this point, the court finds no support in the specification or prosecution

1 history for the definition of "collecting" that Defendants propose.

2      Defendants cite to a passage that describes the function of

3 the gateway device; however the fact that the gateway device

4 preforms monitoring and recording does not mean that those

5 functions are equivalent to "collecting."  Furthermore, the fact

6 that it was asserted during the prosecution history that in an

7 embodiment of the invention, the gateway device can "monitor and

8 track" usage does not mean that a gateway, which collects data,

9 <u>monitors</u> and <u>records</u> as Defendants suggest.

10      The disputed term is readily understood when given its

11 ordinary meaning, and Defendants proposed construction is

12 unsupported and would only add confusion.  The court does not

13 construe the term.

14 **2.  '009 PATENT**

15      1. "single connection between the device and the computer"

| NOMADIX'S CONSTRUCTION | SOLUTION INc.'S CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | connection between the device and the computer that does not copy data between two sessions | connection between the device and the computer that does not copy data between two sessions |

22      Nomadix argues that "single connection" has an ordinary and

23 readily understood meaning and that, therefore, no construciton is

24 necessary.  Defendant Solution Inc. argues that the difference

25 between two connections and one connection is quite complicated,

26 and that construction is necessary because of the "intentional

27 disclaimer, or disavowal of claim scope by the inventor."

28 <u>Phillips</u>, 415 F.3d at 1316.  The court agrees.

The disputed term arises in the context of Claim 1 and 23 of the '099 Patent.  Claim 1 describes:

> A method for providing connectivity to a foreign network for a device having network settings configured for communication over a home network without reconfiguring the network settings of the device, the method comprising:
> . . . .
> splicing the connections between the device and the configuration adapter, and between the configuration adapter and the computer, to form <u>a single connection between the device and the computer</u> such that the device and the computer communicate packets with each other over the single connection without the network settings of the device being reconfigured.

('099 Patent 21:42-49, 22:10-17 (emphasis added.)  Nomadix added "single connection" to overcome a prior art rejection.  In the Examiner's statement for reasons of allowance, the Examiner recognized that one of the things that was not disclosed or suggested in a prior art was specifically the "splicing the connections . . . to form a single connection between the device and the computer . . ."  ('099 Patent, Oct. 12, 2004 Notice of Allowability.)

In understanding the significance of forming a "single connection, the court looks to the '099 Patent's specification.  In the "SUMMARY OF THE INVENTION," Nomadix explains that the invention provides for a system whereby:

> whether or not the client is configured to use a proxy service, a connection is established between the client and the configuration manager, and between the configuration manager and the origin server.  <u>Rather than copying data between these two sessions, the present invention</u> transfers the session flow control functions to the endpoints to effectively splice the connections together while maintaining the end-to-end semantics.

11

1  ('099 Patent 3:37-45.)   Here, Nomadix refers to "the present

2  invention" and distinguishes it from prior art due to its

3  elimination of the need to copy data.   "When a patent . . .

4  describes the features of the 'present invention' as a whole, this

5  description limits the scope of the invention."   <u>Verizon Services</u>

6  <u>Corp. v. Vonage Holdings Corp.</u>, 503 F.3d 1295, 1305 (Fed. Cir.

7  2007); <u>see also</u> <u>SciMed Life Sys., Inc. v. Advanced Cardiovascular</u>

8  <u>Sys., Inc.</u>, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he

9  characterization of the coaxial configuration as part of the

10  'present invention' is strong evidence that the claims should not

11  be read to encompass the opposite structure.").   Based on the claim

12  language and Namadix's disclaimer that the "present invention"

13  eliminates the need for copying, the court agrees that the term

14  "single connection between the device and the computer" requires

15  construction, and the court adopts Solution Inc.'s proposed

16  construction.

17

18

19

20

21

22

23

24

25

26  ///

27  ///

28  ///

**B. Patents asserted by iBAHN**

**1. '754 PATENT**

1. "network access node"*

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| the point where user traffic enters and exits the communications network[1] | the point where user traffic enters and exits a communications network[2] | the point where user traffic enters and exits a communications network |

* term also in dispute for '073 and '376 patents

At the September 9, 2011, <u>Markman</u> hearing, the parties narrowed their disputed construction of "network access node" to either, as Nomadix proposed, "the point where user traffic enters and exits <u>the</u> communications network," or, as iBAHN proposed, "the point where user traffic enters and exits <u>a</u> communications network." (<u>See</u> Transcript at 94:3-95:25, September 9, 2011, <u>Markman</u> hearing (emphasis added).)

Because iBAHN's construction is supported by intrinsic evidence and the Patents' claim language, the court adopts the counterclaimant's construction.

The term "network access node" is found in the '754 Patent, the '073 Patent, and the '376 Patent. These iBAHN patents generally describe a method for providing network and Internet access via a plurality of network access nodes. For example, Claim

---

[1]  Nomadix proposed this construction at the September 9, 2011, <u>Markman</u> hearing.

[2]  iBAHN proposed this construction at the September 9, 2011, <u>Markman</u> hearing.

1   1 of the '754 Patent claims: "A method for providing Internet

2   access to a first computer via a first one of a plurality of

3   network access nodes in a network using a plurality of globally

4   unique IP address . . . ."  ('754 Patent 14:5-10.)

5        The connection is "via" and there are a "plurality" of

6   "nodes."  The plain language of the claim does not require that a

7   network access node communicate with only "the", i.e. a single and

8   identifiable network.  (See '754 Patent, Abstract, explaining that

9   the Patent describes a method for "providing access to a network

10   via a first one of a plurality of network access nodes".)  The

11   court adopts iBAHN's proposed construction.

12              2. "an Internet transaction"

13

| AGREED UPON CONSTRUCTION |
|---|
| An internet transaction, such as sending or receiving a web page, an email, a text message or a tweet. |

14

15

16

17

18        The parties agreed at oral argument to the following

19   construction of the term "an Internet transaction": an internet

20   transaction, such as sending or receiving a web page, an email, a

21   text message or a tweet.  (See Transcript at 104:3-9, September 9,

22   2011, Markman hearing.)

23              3. "associating a first one of the globally unique
                 IP addresses with the first network address for
24                conducting an Internet transaction"

25

26   ///

27   ///

28   ///

14

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| in order to conduct an Internet transaction, assigning to the first globally unique IP address **from a pool of available** addresses and removing it from **the pool** | assigning a first one of the globally unique IP addresses from the pool of such addresses with the first local IP address in order to conduct an Internet transaction | No construction |

The parties dispute whether "associating" a globally unique IP address with a first network address requires "removing it from the pool." Nomadix maintains that it does, and iBAHN argues that the address is simply assigned, not removed.

iBAHN's proposed construction is consistent with the claim language and the specification. For example, the '754 Patent's Claim 1 states that Internet access is provided by "associating a first one of the globally unique IP addresses with the first network address for conducting an Internet transaction." ('754 Patent 14:16-19.) There is no indication in the claim language that the address is somehow "removed" or unavailable. (<u>See also</u> '754 Patent 3:11-16, 3:24-37, 6:24-35 explaining that the address is temporarily associated with the local IP address associated with the guest computer.)

The only suggestion that the globally unique IP addresses that are associated with guest computers are unavailable for use by other computers until the transaction is completed is in the context of a preferred embodiment. ('754 Patent 4:18-20, 6:23-28.) Since Nomadix's requirement of removal from the "pool of available address" would limit the claims to a single embodiment, the court

1  rejects Nomadix's proposal.

2      Because neither proposed construction would reduce confusion

3  and because the claim term is clear from its plain and ordinary

4  language, the court concludes that no construction is necessary.

5                    4. "disassociating the first one of the globally
                        unique IP addresses from the first network
6                        address [upon termination of the  Internet
                         transaction]"

7

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| returning the first globally unique IP address to the pool of available addresses so that it is no longer assigned to the first local IP address | No construction necessary. However, if the term requires any construction, it should be "upon termination of the Internet transaction, reassigning the first one of the globally unique IP addresses into the pool of such addresses for use by any network address" | No construction. |

18      iBAHN argues that the term "disassociating the first one of

19  the globally unique IP addresses from the first network address

20  upon termination of the Internet transaction," requires no

21  construction and is readily understood by both a person of ordinary

22  skill in the art and a jury.  (iBAHN's Reply Claim Construction

23  Brief 18:24-28.)  The court agrees.

24      Nomadix would impose a limitation on the globally unique IP

25  address that it cannot be a shared resource.  As the court

26  explained above in its construction of the term  "associating a

27  first one of the globally unique IP addresses with the first

28  network address for conducting an Internet transaction," such a

16

1  reading of the Patent is unsupported by the claim language or

2  intrinsic evidence.  The '754 Patent is clear in Claim 1 that upon

3  "disassociating the first globally unique IP address from the first

4  network address upon termination of the Internet transaction," the

5  first globally unique IP address is then "available for association

6  with <u>any</u> of the network addresses."  ('754 Patent, Claim 1

7  (emphasis added).)  Because the term is self defining and

8  construction would create not reduce confusion, the court does not

9  construe the term.

10  **2.  '073 PATENT**

11          1. "network having a plurality of users associated
                 therewith"*

12

13

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| network having a plurality of users who have been granted access to the network | No construction necessary. However, if the term requires any construction, it should be "network with multiple users associated with the network" | No construction. |

19  * term also in dispute for '376 patent

20          The parties dispute what is meant by a "network having a

21  plurality of users associated therewith."  Nomadix maintains that

22  construction would be helpful for the jury and that the nature of

23  the association between the users has an important bearing on the

24  scope of the claims.  (Nomadix's Reply Claim Construction Brief

25  21:9-18.)  iBAHN states that the term does not require

26  construction.  The court agrees.

27      The only support Nomadix offers for its construction is

28  language from Claim 1 of Patent '073 that identifies two sets of

1 users, a first set that is the "plurality of users" associated with

2 the network and a second set that is a subset of the first; and a

3 suggestion from the specification that security measures are

4 inherent in any user association with a network. (Id. 21:19-

5 22:24.) The language from Claim 1 does indeed identify a

6 "plurality of users" that are using the conference services

7 provided by the invention, and there is also at least one subset of

8 users that are referred to as "selected users" who are "using the

9 group identification tag." ('073 Patent 15:54-65.) The fact that

10 users are divided into subsections does not limit users to ones

11 that have been "granted access." Similarly, whether or not the

12 Patent specification contemplates security for the network does not

13 limit the Patent to users that are "granted access."

14       Without more, the court is not persuaded that the "plurality"

15 of network users are only those that have been affirmatively

16 granted access. The court notes that "granted access" would also

17 add not reduce confusion. Because no such limitation is found in

18 the claim language or specification, the court declines to

19 construct the term.

20              2.    "conference"*

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| an assembly of persons at common geographic location | No construction necessary. However, if the term requires any construction, it should be "a group of selected users" | No construction |

27 * term also in dispute for '376 patent

28       The parties dispute what it means for a specific group of

18

1 | selected users to be "attendees of [a] conference." ('073 Patent,
2 | Claims 1,10; '376 Patent, Claim 2.) The dispute with respect to the
3 | term "conference," is whether the term is necessarily limited to a
4 | specific geographic location. iBAHN maintains that it is not and
5 | argues that the term need not be construed. Nomadix would include
6 | a limitation that "conference" refers to an assembly of persons at
7 | a common geographic location. In support of its position, Nomadix
8 | looks to the specification which states that "embodiments of the
9 | rpesent invention may be used to provide special levels of service
10 | to specific user groups such as, for example, the attendees of a
11 | conference at a hotel property." (Nomadix' Reply Claim
12 | Construction Brief 24:23-26 (citing '073 Patent 14:22-25).)

13 |       The court is not persuaded that the limitation Nomadix seeks
14 | is proper. The plain language of the relevant claims states
15 | nothing that requires the gather of selected users at a common
16 | geographic location. The specification simply requires that the
17 | "technique described" could be utilized to restrict content so that
18 | it is only accessible to "specific identifiable groups." ('073
19 | Patent 15:23-26.) Indeed, both of the Patents at issue are devoid
20 | of any reference to a geographic limitation on the group of
21 | selected users. Absent contravening evidence from the
22 | specification or prosecution history, plain and unambiguous claim
23 | language controls the construction analysis, and it is generally
24 | improper to import a limitation from an embodiment into the claims.
25 | DSW, Inc. v. Shoe Pavilion, Inc., 537 F.3d 1342, 1347 (Fed. Cir.
26 | 2008). Here, neither the Patents' specifications nor claims
27 | support the geographic limitation Nomadix proposes. The court
28 | declines to construe the term.

**IV.    CONCLUSION**

        For the reasons set forth above, the court adopts the claim constructions described above.

IT IS SO ORDERED.

Dated:October 24, 2011

                                    DEAN D. PREGERSON
                                    United States District Judge